RONEY, Circuit Judge:
H&B Equipment Co., Inc., a distributor for International Harvester Co., severed relations with International Harvester and brought this antitrust suit against it under the Sherman Act, 15 U.S.C.A. §§ 1, 2. At trial, H&B sought to prove monopolization, a conspiracy to drive H&B out of business, customer restrictions, and unfair competí *242 tion. The district court granted a directed verdict for the defendant at the close of H&B’s case on the federal antitrust claims, without specifically addressing the state law claims of unfair competition. We affirm. H&B failed to introduce adequate proof of monopolization, conspiracy, or injury from customer restrictions, and in that context we decline to consider the allegations of unfair competition.
This case involves the market in Houston, Texas, for bulldozer-loaders, backhoes, and hydraulic excavators, known collectively in the International Harvester organization as the “J-12” line. In 1970, International Harvester had little or no penetration of that already crowded market. Its machines faced competition from John Deere, Case, Massey-Ferguson, Allis Chalmers, Caterpillar, Hein Warner, Drott, Link Belt, and Poclain. Desiring to expand, International Harvester allowed four of its agricultural dealers there to sell bulldozer-loaders and backhoes, and engaged H&B to sell and service all types of J-12 machinery.
H&B experienced moderate success. After a loss in 1971, it earned an equivalent profit in 1972. International Harvester had, by acquiring the Fench company Yum-bo, added a new hydraulic excavator, the 3960. H&B sold the first 3960 bought in the United States. International Harvester, however, was still not satisfied. Feeling a “full line” dealer would do better, it attempted to arrange financing for an H&B expansion. When that effort failed, in late 1972 it established a company store, International Harvester Sales and Service, Inc., in direct competition with H&B.
H&B’s fortunes immediately turned sour. Viewing the facts in a light most favorable to H&B, as we are instructed to do in reviewing a directed verdict against it, Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir. 1969) (en banc), International Harvester harassed H&B by delaying parts orders and warranty claims, undercut H&B in the marketplace by selling machines just above or even below dealer cost, continued to enforce customer restrictions by not allowing H&B to bid on government sales or sales to rental yards, and drove H&B into a loss position, forcing H&B to terminate in late 1973. After H&B left the market, International Harvester sold the company store to Plains Machinery, which by 1976 was doing in excess of 20 times more J-12 business than H&B had done in its best year as a dealer.

Monopolization

H&B claims International Harvester’s effort to drive H&B out of business was part of an attempt to monopolize the Houston market for hydraulic excavators, and so violated Sherman Act § 2. H&B and the company store were the only International Harvester dealers in Houston selling hydraulic excavators, in particular the 3960.
The hydraulic excavator market, however, cannot be confined to International Harvester products alone. H&B principal L. S. Hackney testified that, in addition to International Harvester, rivals Drott, Hein Warner, John Deere, and Case sold hydraulic excavators in 1971, and the rival brands were “very popular.” He did not know their sales, but was “sure” they were more than those of the 3960. The plaintiff introduced into evidence an advertisement for the 3960 published in Texas Contractor which read: “International Harvester has simplified your toughest job: getting the best buy in 7/8-yd. and 5/8-yd. Hydraulic Excavators. You know the almost Las Vegas odds of picking a winner from more than 20 makes.”
To succeed in claiming monopolization, a plaintiff must show the defendant has achieved a monopoly, or, for attempt, demonstrate a “dangerous probability of success.” Yoder Bros., Inc. v. California-Florida Plant Corp., 537 F.2d 1347, 1366-1369 (5th Cir. 1976), cert. denied, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977). See Annot., 27 A.L.R.F. 762 at § 9. No hard and fast rule exists for determining the market share necessary to establish a monopoly. Compare Heatransfer Corp. v. Volkswagenwerk, A.G., 553 F.2d 964, 981 (5th Cir. 1977) (71-76 percent), cert. denied, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d *243 792 (1978), with United States v. Grinnell Corp., 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) (87 percent). Whatever the test, H&B has failed to meet it. It introduced no statistics on the number and size of firms in the market, and every hint the record gives indicates International Harvester’s market position fell far short of being dominant.
The evidence at trial shows that H&B attempted to establish a submarket of hydraulic excavators consisting of the 3960 alone. See Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). On appeal, H&B’s attorney cites that testimony but characterizes it as referring to hydraulic excavators generally. That market is competitive. The trade in the 3960 belongs to International Harvester alone, but the evidence that it is a submarket by itself is short of the substantial evidence needed to create an issue for the jury. The evidence showed that the only characteristic which distinguished the 3960 from other hydraulic excavators was that it had a special undercarriage which did not need service and could operate in three feet of mud. That feature, however, was quickly copied by other dealers. Even without it, other excavators could accomplish the same work. No evidence establishes that the industry recognized the 3960 as being special, or that it exclusively served the needs of a readily identifiable class of customers. In fact, it hardly served anyone at all. H&B sold only three, including one at distress prices and another to an enterprise in which Hackney was a partner. That one customer told H&B’s expert witness that it would take a rise in price of as much as 30 percent before he would consider another machine hardly constitutes substantial evidence that the 3960 was in a class by itself. Even the most ordinary greyhound has its devoted fans at the racetrack.

Plurality of Parties

H&B proffers two distinct theories of liability under § 1 of the Sherman Act. First, it alleges International Harvester, as part of its dealership arrangement, blocked H&B from selling to certain “house account” customers, including governments and rental yards. See White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). Second, it asserts tha International Harvester engaged in harassment, discriminatory treatment, and predatory pricing, all with the intent of eliminating it from the market. See Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338 (3d Cir. 1975).
Section 1 is both broader and narrower than § 2. Under § 1, H&B need not show monopoly power. An unreasonably anticompetitive effect, or conduct presumed under the per se rubric to have that effect, is all that is required. Section 1, however, unlike § 2, requires the existence of a “contract, combination, or conspiracy.” The assumption behind the statutory scheme is that anticompetitive conduct by firms lacking monopoly power threatens the sound operation of a free economy only when done in concert with others.
H&B thus faces the threshold requirement of identifying a co-conspirator who agreed with International Harvester to inflict injury on H&B. H&B may claim that H&B conspired with International Harvester to honor customer restrictions. Response of Carolina, Inc. v. Leasco Response, Inc., 537 F.2d 1307, 1315, 1319-1320 (5th Cir. 1976). The meeting of their minds on that subject, even temporarily, satisfies the conceptual need for a combination, and the Supreme Court has rejected the notion that a plaintiff’s participation in such a scheme would result in “unclean hands.” Perm a Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968).
H&B, however, could hardly be said to have agreed with International Harvester that H&B would be driven to financial ruin. See Walker v. Providence Journal Co., 493 F.2d 82, 87 (1st Cir. 1974) (refusal to deal). Consequently, H&B has attempted to identify a co-conspirator within the International Harvester organization.
*244 One point that is well established, at least within this Circuit, is that a corporation cannot conspire with its wholly-owned, unincorporated sales division. Cliff Food Stores, Inc. v. Kroger, Inc., 417 F.2d 203, 205-206 (5th Cir. 1969). Accord, Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 82-84 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); Ark Dental Supply Co. v. Cavitron Corp., 461 F.2d 1093, 1094-1095 n. 1 (3d Cir. 1972). But cf. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 469 n. 4, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (declining to reach the question). Treble damages should not be assessed against a corporation merely because it has adopted an organizational division of labor, especially when the separate parts are united under corporate law. Applied here, that principle eliminates the possibility that the company store might be a co-conspirator. Though it kept separate books, it was not separately incorporated, it bore the International Harvester name, and the company absorbed all losses.
H&B argues that even if the store is not a separate conspirator, its manager, Clay Mumme, may be. This proposition swims upstream, because as a general rule a corporation cannot conspire with its own employees. Solomon v. Houston Corrugated Box Co., 526 F.2d 389 (5th Cir. 1976); Nelson Radio & Supply Co. v. Motorola, 200 F.2d 911 (5th Cir. 1952), cert. denied, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953); Annot., 20 A.L.R.F. 682 at § 7. A corporation can act only through its employees, and if an agreement between a corporation and an employee could be a Sherman Act conspiracy, the plurality requirement would lose all meaning.
An exception to the rule exists for the rare instance in which employees have an independent personal stake in achieving the object of the conspiracy. Poller v. Columbia Broadcasting Co., 368 U.S. 464, 470, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338, 1341 & n. 1, 1345 (3d Cir. 1975); Greenville Publishing Co. v. Daily Reflector, Inc., 496 F.2d 391, 399-400 (4th Cir. 1974); Johnston v. Baker, 445 F.2d 424 (3d Cir. 1971).
No such stake, however, was shown here. H&B relies on testimony by Hackney that Gillar told him that “if Mr. Mumme had done — did a good job for International Harvester, he could end up owning the store on a co-op with International Harvester.” The benefit Mumme was to receive would flow entirely from International Harvester, and is indistinguishable from other forms of compensation, such as salary. In the cited cases, the employees had interests in economic entities separate from the principal defendant. In Coleman Motor Co., for example, the conspirators were managers of factory dealerships, but the dealerships were separately incorporated and enough managers to satisfy the conspiracy requirement already owned 25 percent of their dealerships’ stock. See Diehl & Sons, Inc. v. International Harvester Co., 426 F.Supp. 110, 117-118 (E.D.N.Y.1976). Without such an organization legally distinct from the principal defendant, it would be impossible for an employee to have an interest that was truly “independent.”
On appeal, the plaintiff also asserts that Harco Leasing Co. could be a co-conspirator with International Harvester. As the cases have developed, that suggestion is quite plausible. The evidence at trial showed that Harco is a wholly-owned subsidiary of International Harvester, and that certain sales were made by Harco to David Rents & Equipment Co., a rental yard, at a price below H&B’s cost. Harco is separately incorporated, and so it lies outside the internal corporate division doctrine which applies to the company store. Harco appears to be a competitor of the company store in that both served customers in Houston, although they cooperated in their sales efforts. The Supreme Court has held that especially when two corporations compete, the fact that they are both subsidiaries of the same parent will not prevent them from being able to conspire in violation of the Sherman Act. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 215, 71 S.Ct. 259, 95 L.Ed. 219 (1951); see *245 United States v. Yellow Cab Co., 332 U.S. 218, 229, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). But see Knutson v. Daily Review, Inc., 548 F.2d 795, 801-803 (9th Cir. 1976), cert. denied, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977). That Harco’s alleged co-conspirator here was in effect the parent rather than another subsidiary would not appear to be significant. See Battle v. Liberty National Life Insurance Co., 493 F.2d 39, 44 (5th Cir. 1974), cert. denied, 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975). The parent’s choice of form is important. Having availed itself of separate incorporation for Harco, International Harvester marked it off as a distinct entity, and the antitrust laws treat it as such.
Just because Harco could be a co-conspirator, however, does not mean that it in fact was a co-conspirator. To establish Harco’s complicity, the evidence must warrant a finding that International Harvester and Harco had a “meeting of minds in an unlawful arrangement.” American Tobacco Co. v. United States, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). The proof neéd not be direct. It may be circumstantial. It must show, however, that there was
a single plan, the essential nature and general scope of which is known to each person who is to be held responsible for its consequences. Repetitive or parallel transactions may establish the existence of such a joint venture, but isolated instances, explicable without reference to a continuing or broader program, may not.
Hoffman-La Roche, Inc. v. Greenberg, 447 F.2d 872, 875 (7th Cir. 1971) (Stevens, J.).
H&B totally failed to show that Harco knew of a plan to put H&B out of business, or that Harco even knew H&B existed. H&B called no witnesses from Harco. The principal evidence of its participation is an invoice for the sales to David Rents & Equipment Co. While that invoice shows on its fact that the price was below dealer price, it contains no indication that Harco knew of any dealers in the Houston area other than the company store. Witness Jerome Gillar, the International Harvester regional manager, testified that the reason for Harco’s low price was to obtain a large order for which dealer prices would not be competitive. Without passing on the propriety of such a pricing scheme, it is sufficient to note that such a plan makes Harco’s conduct explicable without reference to a “broader program” aimed at eliminating H&B from the market. See Balian Ice Cream Co. v. Arden Farms Co., 231 F.2d 356, 369 (9th Cir. 1955), cert. denied, 350 U.S. 991, 76 S.Ct. 545, 100 L.Ed. 856 (1956) (subsidiaries made independent pricing decisions); Rutledge v. Electric Hose & Rubber Co., 327 F.Supp. 1267, 1271-1274 (C.D.Calif. 1971) (pattern of discounts shown but no conspiracy established), aff’d, 511 F.2d 668, 677 (9th Cir. 1975).

Anticompetitive Effect

In view of this Court’s caution to terminated distributors in Burdett Sound, Inc. v. Altec Corp., 515 F.2d 1245 (5th Cir. 1975), we note that even if H&B had proved a conspiracy to eliminate it from the market, it is doubtful H&B proved the anticompetitive effect necessary to establish a case for the jury under the rule of reason. See Kestenbaum v. Falstaff Brewing Corp., 575 F.2d 564 (5th Cir. 1978); Kestenbaum v. Falstaff Brewing Corp., 514 F.2d 690, 699-700 (5th Cir. 1975), cert. denied, 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976).
H&B seeks to avoid that requirement by alleging the conspiracy was horizontal, so that the per se rule of United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), applies. Conspiracies between a manufacturer and its distributors are only treated as horizontal, however, when the source of the conspiracy is a combination of the distributors. United States v. Arnold, Schwinn & Co., 388 U.S. 365, 372-373, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); cf. Posner, The Rule of Reason and the Economic Approach: Reflections on the Sylvania Decision, 45 U.Chi. L.Rev. 1, 17 (1977) (condemning distributor cartels). Here the asserted originator of the plan to eliminate H&B was the manufacturer, which allegedly established the *246 company store for that purpose. Consequently, antitrust law treats the conspiracy as a vertical restraint, and those restrictions are now judged under the rule of reason. Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).
The first step in establishing an unreasonable restraint of trade is to show anticompetitive effect, either in the intrabrand or interbrand markets. International Harvester’s treatment of H&B, viewed as a dealer substitution, had no adverse effect on competition. See Burdett Sound, Inc. v. Altec Corp., 515 F.2d 1245 (5th Cir. 1975); Bushie v. Stenocord Corp., 460 F.2d 116, 119-120 (9th Cir. 1972). H&B alleges that International Harvester intended to eliminate all other distributors in the Houston market, but in fact no such plan was carried out, and four other dealers continued to compete with Plains Machinery. Cf. Martin B. Glauser Dodge Co. v. Chrysler Corp., 570 F.2d 72 (3d Cir. 1977) (sale of company outlet to third party shows pro-competitive intent), cert. denied,-U.S.-, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978). Absent anti-competitive effect, an unlawful intent will not establish a rule of reason violation, Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918), nor will the use of unfair methods of competition. Northwest Power Products, Inc. v. Omark Industries, Inc., 576 F.2d 83 (5th Cir. 1978).
Even adopting the view that International Harvester reduced intrabrand competition by putting H&B out of business, H&B has not proven the effect to be any other than de minimis. Rivalry from International Harvester’s other dealers makes this situation far different from the exclusive territorial arrangements which introduced the intrabrand competition concept into antitrust law. Though the dealers were geographically separated, their buyers were businesses who took bids, presumably diminishing the importance of location. Competition among brands appears to have been healthy, even in the specialized hydraulic excavator market, where the company store was left as the sole International Harvester representative in Houston. Unlike the record in Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338, 1347 (3d Cir. 1975), the evidence here does not contain substantial expert testimony that the manufacturer’s dealers enjoyed a general shelter from competitive forces and all possessed discretion to raise their prices within a certain range and still make sales.

Injury from Customer Restrictions

H&B tried the customer restrictions aspect of this case under the per se rule of United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), which held restraints similar to those imposed by International Harvester here to be illegal irrespective of their impact upon competition in the particular market in which the parties did business. Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), overruled the per se holding of Schwinn and indicated the rule of reason should be applied. Given the highly competitive nature of the Houston construction equipment market, there is some doubt whether H&B could show the customer restrictions at issue here were unreasonable. See Schwinn, 388 U.S. at 380-382, 87 S.Ct. 1856. We need not reach that question, however, because H&B failed to satisfy crucial elements of proof concerning causation and damages from the customer restrictions.
To succeed, an antitrust plaintiff must show the defendants’ wrongful actions materially contributed to an injury to the plaintiff’s business, and must provide' some indication of the amount of damage done. Terrell v. Household Goods Carriers’ Bureau, 494 F.2d 16, 20 (5th Cir.), cert. dismissed, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974). When showing causation and damages, some plaintiffs can only hypothesize about what the state of their affairs would have been absent the wrong. The very nature of the antitrust violation deprives them of direct evidence, and for this reason the standard for establishing the amount of damages is less than that for proving the fact of injury. Story Parch- *247 meat Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544 (1931).
In the market preclusion context, to show causation a plaintiff must provide some evidence it could have served the market absent the defendant’s wrongful acts. The plaintiff need not document each sale lost. It can, for example, rely on expert testimony concerning its ability to penetrate the market and to succeed in competition with those already there. Pitchford v. PEPI, Inc., 531 F.2d 92, 104-105 (3d Cir. 1975), cert. denied, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976).
When the plaintiff chooses to rely on specific lost sales, see, e. g., North Texas Producers Ass’n v. Young, 308 F.2d 235 (5th Cir. 1962), cert. denied, 372 U.S. 929, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963), it does so subject to the peril that the proof may show an independent reason why the plaintiff’s bid would not have been accepted. M. C. Manufacturing Co. v. Texas Foundries, Inc., 517 F.2d 1059, 1063-1065 (5th Cir. 1975), cert. denied, 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976). A failure to show a specific monetary loss will defeat the plaintiff’s case, Kestenbaum v. Falstaff Brewing Corp., 514 F.2d 690, 697 (5th Cir. 1975) , cert. denied, 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976), and it is not sufficient for a plaintiff to rely on a general allegation that lack of access to the market caused it to go out of business. Foremost-McKesson, Inc. v. Instrumentation Laboratory, Inc., 527 F.2d 417 (5th Cir.
1976) . When the fact of injury is in issue, the “isolated self-serving statements” of a plaintiff’s corporate officers may not provide substantial evidence upon which a jury can rely. Yoder Bros., Inc. v. California-Florida Plant Corp., 537 F.2d 1347, 1371 & n. 25 (5th Cir. 1976), cert. denied, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977).
H&B offered no expert testimony concerning its ability to penetrate the government and rental yard markets which International Harvester reserved to itself. Proof of causation rests on Hackney’s words alone. He testified that he picked up bid proposals from both the Forestry Division of the State of Texas and the City of Houston. Jerome Gillar, the International Harvester regional manager, informed him that government sales were house accounts on which H&B could not bid. Hackney turned the proposals over to Gillar. Hackney thus proved a restriction by International Harvester, but he did not show the restriction caused him injury. Nothing in the record indicates that Hackney could have made the sales if left unfettered. He did not claim he could. He offered no evidence on the size of the sales, or the price at which they were made. He made no attempt to estimate the profits he lost. These omissions are fatal to this aspect of his case.
Hackney offered somewhat stronger proof that he suffered injury from being unable to sell to David Rents & Equipment Co. The orders, for nine pieces of equipment, were large, and he said that if he made a sale of that size it would have made “a big difference in a yearly sales program.” Again, however, Hackney failed to show causation. The machines were sold at 28 percent off list price. Hackney’s cost was 25 percent off list price, and he readily admitted he could not have made a profit at the price International Harvester charged. We cannot assume the price was anything other than a competitive one. International Harvester did not need to lower it to undercut H&B, because the customer restriction prevented H&B from bidding. Hackney testified he normally needed to bid at five percent off list price to make a profit. If so, the customer restriction would not have caused him a loss of profit unless he could have made the sale at a price one-third higher than that charged by International Harvester, a shaky assumption not supported by anything in the record.
Finally, at the close of his testimony, Hackney asserted that International Harvester’s methods of competition had caused him to go out of business. His conclusion, however, rested not so much on the relatively few sales opportunities foreclosed because of customer restrictions as on the comparatively large number of instances in which he claimed price predation by the company store. He provided no quantifica *248 tion to support his thesis. In view of Hackney’s failure to show any individualized loss from the customer restrictions, his uncorroborated testimony, in so far as it can be taken to imply that the customer restrictions materially contributed to his going out of business, failed to meet the standards of Foremost and Yoder.

Unfair Competition

H&B included in its complaint pendent state law claims of unfair competition. On appeal, H&B has raised them in only the most cursory fashion, citing no authorities to support its position. International Harvester has not responded. Having found proper the district court’s directed verdict against H&B on its Sherman Act claims, we exercise our discretion against adjudication of the unfair competition allegations. This disposition should not be viewed as prejudicing in any way a possible state court action by H&B. See United Mine Workers v. Gibbs, 383 U.S. 715, 725-729, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Solomon v. Houston Corrugated Box Co., 526 F.2d 389, 393 n. 6 (5th Cir. 1976).
AFFIRMED.