577 F.2d 248
 18 Fair Empl.Prac.Cas. 1742, 17 Empl. Prac.
Dec. P 8516
Johnny WILLIAMS, on behalf of himself and other persons
similarly situated, Plaintiffs-Appellants,
v.
DeKALB COUNTY, a Political Subdivision of the State of
Georgia, et al., Defendants-Appellees.
 No. 76-2998.
 United States Court of Appeals,
Fifth Circuit.
 July 27, 1978.
Opinion on Denial of Rehearing and Rehearing En Banc. Oct. 10, 1978.
See 582 F.2d 2.
 
 Edward Lundy Baety, Atlanta, Ga., Fletcher Farrington, Savannah, Ga., for plaintiffs-appellants.
 George P. Dillard, Wendell K. Willard, Decatur, Ga., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before TUTTLE and CLARK, Circuit Judges and EDENFIELD*, District Judge.
 TUTTLE, Circuit Judge:
 
 
 1
 This appeal arises from an employment discrimination case brought as a class action under 42 U.S.C. § 1981 to challenge racial discrimination in the hiring, job assignment, promotion, and discharge practices of the DeKalb County (Georgia) Sanitation Department. The district court found that appellant Williams was a proper class representative and certified three subclasses of employees composed of: (1) unknown persons whose ability to be employed is adversely affected by the defendants' educational and testing requirements; (2) current black employees whose employment opportunities are restricted on account of race; and (3) former black employees whose discharge or other termination from employment resulted from racial bias. Injunctive, declaratory, and monetary relief was sought for the class members. The case also presents Williams' individual claims of racial discrimination in his discharge and promotion attempts. After a trial on the merits of the individual and class claims, the district court entered judgment for the defendants.
 
 I.
 
 2
 The DeKalb County Sanitation Department is divided into six divisions: administration, residential collections, commercial collections, incinerator, landfill, and solid waste disposal. Although Williams presented statistics relating to the racial breakdown of employees in each of these divisions, the bulk of the evidence dealt with the residential collections division in which Williams was formerly employed, and, to a lesser extent, with the administration and commercial collections divisions.
 
 
 3
 Employees in the residential collection division are arranged in a hierarchy system resembling a pyramid. The bulk of the employees occupy low-level nonsupervisory positions as trash collectors. Supervisory personnel are divided into four classifications. The highest ranking member of the residential collections division is the sanitation collection superintendent, who organizes and directs the activities of the division's employees. Beneath him are three field supervisors II, who are each responsible for supervising refuse collection in a designated portion of the county. The next classification includes approximately 16 field supervisors I, who oversee the work of several collection teams and vehicles. The lowest supervisory position in this division is that of driver foreman. This classification includes approximately 116 persons who operate a refuse collection truck and supervise a small group of trash collectors. Each of the supervisory employees above the level of driver foreman is responsible for investigating and handling customer complaints.
 
 
 4
 A similar hierarchy system is utilized in the commercial collections division. A collection superintendent oversees the work of four field supervisors, who in turn are responsible for the vehicle operators and collectors. Administration of the entire department is in the hands of the Sanitation Director. Other positions in the administration division include an assistant director, an office manager, and a lower level supervisor.
 
 
 5
 Statistical evidence presented by Williams proved beyond any question that the top positions in these and the other divisions were occupied by whites, while the trash collectors are predominantly black. No black has ever progressed above the level of field supervisor I, the position held by Williams before his discharge.
 
 
 6
 Williams, a high school graduate with at least one year of college, was first hired by DeKalb County in 1968 as a mail clerk, a position which he held until he was drafted in 1969. Upon completion of his service in December 1970, Williams returned to a better paying position with the county as an automotive service clerk. A year later he was hired to serve as a field supervisor I in the Sanitation Department after successfully passing the required examination. Department policy required new employees to serve a six-month probationary period followed by an evaluation to determine whether the appointment would be made permanent. At the end of his six-month test period in June 1972, Williams' superiors rated him as unsatisfactory and recommended against continued employment. Their unfavorable assessments were based on what they considered Williams' unsatisfactory response to customer complaints and his inability to get along with the workers under him. However, Williams complained to the director of the Department (Humma) that his evaluators had never met with him or offered him suggestions for improvement during his probationary period. Director Humma therefore decided to keep Williams on as a permanent employee after counselling him to make a better effort to get along with others.
 
 
 7
 Both before the conclusion of his probationary period and thereafter until his discharge, Williams made three unsuccessful attempts to be promoted to higher ranking supervisory positions. His final promotion effort was cut short when he was discharged from the Sanitation Department in August 1972. He filed this suit the following December.
 
 
 8
 The district court found that Williams' evidence was sufficient to make out a prima facie case of discrimination on both the classwide and individual claims. But the court concluded that the defendants had met their burden of proof on all issues and entered judgment adverse to Williams on all counts. A careful examination of the record has convinced us that the district court erred in certain of its findings of fact and conclusions of law.
 
 II. DISCHARGE
 
 9
 Approximately two months after the decision had been made to keep Williams on as a field supervisor I, the director of the Sanitation Department (Humma) circulated a memo on Friday, August 18, 1972, to all supervisors, requiring that a sufficient number of employees and supervisors remain available after normal route collections on Fridays to return to areas from which customer complaints had been received during the day, to pick up uncollected trash, and to handle any other valid customer complaints before the weekend. The memo was an attempt to correct a problem with the workers' leaving early on Fridays after receiving their pay, a situation which meant that customer complaints went unanswered until the next week.
 
 
 10
 The record reveals that Williams objected to the contents of the directive and attempted to voice his complaint to Bedford, the residential collections superintendent. After some initial efforts to talk to Bedford, in which Williams was told to speak to his immediate superior, Williams finally confronted Bedford in his office on the Monday after the memo was circulated. Bedford's version of the meeting was that Williams cursed and pointed a finger in his face. Williams denied any belligerent behavior. There were no witnesses, although some persons who were in the vicinity at the time testified at the trial that they had heard no loud talking. Bedford reported the incident to Humma, who then discussed the matter with Williams and dismissed him the next day. In a letter dated August 22, 1972, Humma informed Williams that he was being discharged for insubordination and failure to cooperate.[1] The sole ground specified in the letter was Williams' behavior at the August 21 meeting with Bedford:
 
 
 11
 On August 21, 1972, Mr. Bedford, your Superintendent and duly constituted superior, reported to me that you were insubordinate which involved belligerency, cursing and shaking your finger in his face.
 
 
 12
 3. I consider this action on your part as a complete failure to cooperate with me, and further your actions and words toward Mr. Bedford as insubordination.
 
 
 13
 The discharge was effective the next day, August 23, 1972.[2]
 
 
 14
 In its order of December 15, 1975, the district court found that Williams had met his initial burden of making out a prima facie case of racial discrimination in his discharge. The court based that conclusion on the "undisputed statistical evidence of absence of blacks at and above the Supervisor II level," and found that the discharge "could represent a sudden change of attitude towards Williams when he sought advancement to a higher position . . . occupied only by white people." In fact, although the district court does not mention this point, Williams had sought promotion to the very position to which Bedford had recently been appointed.
 
 
 15
 We agree with the district court that Williams' evidence caused "the burden (to fall) fairly heavily upon the defendant to show that the discharge of Williams was not related to his application for promotion into that area of responsibility." The district court held then and in its subsequent order of May 17, 1976, that the defendants had met this burden. The court found in its second opinion, in which it denied Williams' motion for reconsideration and sought to clarify its reasons for upholding the discharge, that Williams had failed to work on Fridays and that Williams "was not a first time offender." Both of these findings of fact are totally unsupported by the record and, therefore, we must reverse them as clearly erroneous under Fed.R.Civ.P. 52(a). Because we are unable to find in the record any evidence offered by defendants which is adequate to rebut Williams' prima facie case, we reverse the judgment of the district court on this issue and render judgment for Williams on his discharge claim.
 
 
 16
 It appears that the district court relied upon defendants' statements contained in supplementary briefs for its conclusions that Williams had refused to work on Fridays and was not a first time offender.[3] However, these statements are simply without evidentiary foundation and the court should not have adopted them. The evidence shows only that Williams attempted to voice his objections to the memo. There is no indication in the record that he failed to stay on his job on the Friday before his discharge. Nor did Humma's letter of termination even allude to such an act of disobedience. Neither Humma nor Bedford testified at trial that Williams had disobeyed the order; in fact, no one testified as to whether the memo was even in effect on that Friday. Williams' testimony suggests that he was not the only supervisor who was upset by the memo, and his requested interview with Bedford may have been intended to express the feelings of his peers and to get an explanation of the memo. It also appears that the memo had its greatest impact on supervisors in the residential collections division, where many of the lower level supervisors affected by the order were black, rather than in the commercial collections division where all supervisors were white. However, Williams was never given an opportunity to express these views. If Williams was serving as a group spokesman, then the lack of similar reactions from other supervisors I is not surprising.
 
 
 17
 In order to rebut Williams' prima facie case, the defendants should have shown by comparative evidence that the sanction of discharge meted out to Williams was no harsher than the treatment of white employees. East v. Romine, Inc., 518 F.2d 332 (5th Cir. 1975). The defendants failed to do this, yet "comparative evidence lies at the heart of a rebuttal of a prima facie case of employment discrimination." Id. at 339. Williams, as part of his proof, presented evidence which supports his position that white employees accused of acts of insubordination and other misbehavior received less severe sanctions than that imposed on him. For example, one white employee, who criticized his superiors and displayed an unsatisfactory attitude toward criticism and who was involved in 12 accidents in 16 months, was reprimanded, suspended, and transferred, but not discharged. Personnel files for other employees suggest that reprimands and brief suspensions without pay were typical forms of dealing with employee infractions even in serious cases involving preventable accidents and unsatisfactory work.
 
 
 18
 The district court dismissed this evidence as unpersuasive in part because the court erroneously believed that Williams was "not a first time offender."[4] However, the record belies this because a letter from the director of the Merit System to Williams states that his file contained no "evidence of reprimand, disciplinary action, nor termination" as of July 5, 1972. This letter was written in response to an inquiry from Williams, who wished to appeal the unfavorable evaluations which had been made after his probationary period. The Merit System director informed him that he had nothing to appeal because his record was unflawed. Yet the district court inexplicably refers to "stringent disciplinary action" which had been recommended by Williams' immediate supervisor prior to his dismissal but which had been overruled by Humma. We can find no justification for this statement in the record before or after the July 5 letter.
 
 
 19
 Because the defendants failed to rebut Williams' prima facie case, the district court should have entered judgment for Williams on the discharge claim. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Causey v. Ford Motor Co., 516 F.2d 416 (5th Cir. 1975).
 
 III. PROMOTION
 
 20
 After Williams transferred into the Sanitation Department, he made three attempts to gain promotion to higher supervisory positions. Although the district court characterized Williams as "a man of considerable ability," the court viewed his "ambitions for advancement" as an indication that he was "something of an unsatisfactory employee" because "from the moment he 'got on the payroll' he was seeking to 'take the boss' job.' " It is difficult to understand the district court's unflattering characterization of Williams' efforts to better his position. The efforts may also be viewed as proper attempts to move ahead in salary and responsibility to a level commensurate with one's talent and education. Williams breached no department policy by applying for promotion during his first six months and shortly thereafter. The Sanitation personnel readily admitted in their answers to Williams' interrogatories that no specific length of time had to be spent at one level before advancement to the next level.
 
 
 21
 Williams filed his first application for promotion on April 12, 1972, seeking to fill a vacancy as field supervisor II. He took the promotion examination a week later and was certified as eligible along with four others, including one black who had served as a field supervisor I since 1969. Director Humma interviewed Williams a short time later. According to Williams' testimony, Humma told him that he had already selected a person to fill the job and that Williams was trying to progress too fast. The position was awarded to a white man, Hicks, who had served as field supervisor I with DeKalb County for one year and had six years experience in the Clarkston Sanitation Department. The district court found that Hicks had been selected because he was far more qualified than Williams.
 
 
 22
 Williams next applied for one of two newly created positions as pulverization plant manager. The Department had requested the Merit System on July 5, 1972, to forward to it a list of eligible applicants. Williams applied on July 27 and was told that the deadline for submitting applications had closed. The exam was held as scheduled on July 28, and Williams was not permitted to take it. The positions went to two white men on August 16.
 
 
 23
 Williams' final application was for the position of sanitation collection superintendent of residential collections. The Department submitted a requisition to the Merit System for a list of eligible persons on July 24. Williams applied on August 14 and was notified that the exam was to be held on August 23. He was discharged effective that day so he never took the exam. Bedford got the job on August 16.
 
 
 24
 As for these last two positions, the district court held that it need not consider Williams' allegations of discrimination because he had not been certified by the Merit System for either position. However, our review of the record reveals several disturbing irregularities in the procedures which led to the filling of these positions. The district court ignored these irregularities; therefore, we must vacate the judgment and remand for reconsideration of the promotion issue so that these factors may be given appropriate weight.
 
 
 25
 Williams was precluded from competing for a position as pulverization plant manager on the ground that his application was too late. It was submitted only one day before the date scheduled for the exam. However, Williams and another employee testified that job notices were not posted far enough in advance or in conspicuous places. Moreover, the job notice, which is included in the record before us, specifies that the position would remain open until further notice. Yet there is no indication that any subsequent notice was given to alert potential applicants of the approaching deadline. Nor was the examination date posted. If, in fact, no such notice was ever given, or if it was inadequately circulated, then Williams was unfairly denied an opportunity to compete for the job openings. A job notice which specifies no deadline provides too easy a means for covertly denying blacks an opportunity to be considered for promotions, for any such applicant could simply be told that the deadline had passed.
 
 
 26
 We are concerned about another apparent discrepancy in the procedure which led to the filling of these two positions. Testimony at the trial indicated that the two white men who were hired as pulverization plant managers were in training for the position during the so-called open competition for the jobs. This would certainly give them an advantage over other applicants. The district court, on remand, should determine whether the training was made available to other applicants and whether the availability of training was made known well in advance and on a general basis.
 
 
 27
 As for the position of collection superintendent, Bedford admitted at trial that he learned of the job opening from the white incumbent who was resigning. He could not recall seeing a job notice in the county newsletter and none is contained in the record before us. Even more troubling is the fact that Williams was notified that he could take the exam on August 23; yet Bedford was appointed to the position one week before that date. We are simply at a loss to understand how the position could be fairly filled before other applicants were even examined. It appears to us that Bedford was selected for the position in an expedited fashion without allowing time for other applicants to compete for the position. The fact that these questioned appointments were made by white superiors causes us additional concern. See Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972).
 
 
 28
 The district court on remand should determine if there is some nondiscriminatory explanation for these irregularities. Otherwise, the record as we view it would require reversal on Williams' individual claim. Although proper procedures appear to have been followed in filling the position of field supervisor II, the job for which Williams first sought promotion, we must vacate the district court's finding that Hicks was the most highly qualified applicant because the court made no mention of the relative qualifications of another black applicant, Norris Smith, who had served in the capacity of field supervisor I a much longer time than Hicks and whose personnel file is overflowing with official commendations for his excellent performance at his job. The Department cannot justify its failure to promote Williams by claiming that the white hired was the most highly qualified if another black applicant was better qualified.
 
 IV. CLASS CLAIMS
 
 29
 The class aspects of this case challenged the educational and testing requirements imposed on new applicants and those seeking advancements as well as general practices relating to job assignments and promotions. The district court properly held that the evidence made out a prima facie case of classwide discrimination, but held that the adoption of an affirmative action program in 1974 rebutted the prima facie case. This was error because a subsequently adopted program, no matter how laudatory, is wholly irrelevant to the issue of discrimination vel non at an earlier date. Rice v. Gates Rubber Co., 521 F.2d 782 (6th Cir. 1975). Williams' class action challenges practices in existence in 1972, well before the county had adopted an affirmative action program. While the adoption of an affirmative action program might affect the remedy imposed by the district court, it does nothing to rebut the prima facie case of discrimination as of 1972.
 
 
 30
 A prima facie case of classwide discrimination as of 1972 was amply proved by statistics which conclusively established that blacks had never penetrated the upper echelons of the Sanitation Department. Other evidence which supported the appellant's class claim was also presented. For example, Williams proved that, although there was a large turnover of employees at the level of trash collectors, there was a significant stability in the supervisory positions. Promotions from within the department ranks were favored, and blacks enjoyed the benefits of this policy up to the level of supervisor I. While whites were promoted up the ranks to the higher positions, the upward mobility of blacks unaccountably halted at the lower levels. This was true in spite of numerous personnel files which demonstrate the availability of a pool of highly competent and experienced blacks. The procedural irregularities referred to above in connection with Williams' individual claim of discrimination in promotions are also relevant on the class claim.
 
 
 31
 Other than the self-serving assertions of department members that race was never a factor in advancement, the record is wholly devoid of any explanation for the failure to appoint blacks to upper level positions when openings became available. Therefore, we hold that the class has proved racial discrimination in job assignments and promotions within the Sanitation Department, and judgment must be entered for the appellant. The members of the class are presumptively entitled to back pay and upon remand they must be given an opportunity to establish their claims in keeping with McCormick v. Attala County Board of Education, 541 F.2d 1094 (5th Cir. 1976), and Mims v. Wilson, 514 F.2d 106, 109-110 (5th Cir. 1975). While the existence of the affirmative action program may be considered by the district court on remand in determining whether injunctive relief is appropriate, that program does not affect the availability of back pay as a remedy.
 
 
 32
 As to the educational and testing requirements utilized by the department, the district court was totally silent. We note that during the trial the defendants attempted to show that certain levels of education were merely desired but not required. However, the record contains numerous job notices, some dated after the adoption of the affirmative action program, which clearly state that a high school diploma or some other level of school is a qualification for the job. Such a notice would obviously serve to mislead and to deter potential applicants if the requirement was not followed. Moreover, at least one black employee was demoted when he failed to pass the high school equivalency test. The department admitted that the job relatedness of these educational criteria has never been validated, although a study may be under way currently.
 
 
 33
 In the absence of any findings of fact in the district court on the educational and testing practices, we must remand the portion of the case for fact findings and for application of the teachings of Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280; Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and Hester v. Southern Railway Co., 497 F.2d 1374 (5th Cir. 1974). See Cooper v. Allen, 467 F.2d 836 (5th Cir. 1972).
 
 V. CONCLUSION
 
 34
 We agree with the trial court's findings that the plaintiff made out a prima facie case of racial discrimination as to all of his relations with the defendants. We disagree for the reasons stated that the defendants carried the burden of showing that the actions adversely affecting Williams and the class were not racially motivated.[5]
 
 
 35
 In summary, we reverse the judgment of the district court on Williams' discharge claim and direct that he be reinstated with full back pay and seniority. We vacate the district court's judgment on Williams' promotion claim and remand for consideration of the procedural irregularities we have noted and to permit the court to enter judgment for Williams if the defendants are unable to rebut Williams' prima facie case.
 
 
 36
 And finally, we reverse the judgment of the district court on the class claims, and remand for the trial court to enter judgment for the class on the liability issue as to promotions and job assignments, and for an appropriate remedy including back pay, leaving injunctive relief to the discretion of the court. We also remand on the class claims as to testing and education requirements to permit the district court to deal initially with these issues.
 
 
 37
 REVERSED and REMANDED.
 
 
 38
 CHARLES CLARK, Circuit Judge, specially concurring:
 
 
 39
 I agree that this case should be remanded to the district court for further action. However, I respectfully decline to concur in the terms of that remand set forth by the majority. If this case is to be decided now, our precedent appears to me to require that the district court be directed to apply the teachings of Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), in assessing whether the plaintiff has made out a prima facie case of racial discrimination.
 
 
 40
 The district court decided this case prior to Davis, which held that the racially disproportionate impact of an employment practice neutral on its face is insufficient, standing alone, to establish racial discrimination violative of the equal protection component of the fifth amendment Due Process Clause. The Supreme Court distinguished the standards for liability under Title VII (which do not require proof of discriminatory purpose) from those which govern under the fifth and fourteenth amendments to the Constitution (which require that purposeful discrimination be shown).
 
 
 41
 Davis precludes a plaintiff from making out a prima facie case of discrimination in violation of his right to equal protection of the law by statistical evidence alone. Such statistical evidence, by itself, can only show disproportionate impact, which does not establish an equal protection violation. I construe Nevett v. Sides, 571 F.2d 209 (5th Cir. 1978), which applied Davis to an action brought under sections 1981 and 1983, to require us to apply that same analysis to the case at bar. Accordingly, I concur in the remand of the case to the district court, but I would instruct that court to determine whether the plaintiff's evidence including the statistical data established a prima facie case of discriminatory purpose which, if unrebutted, would establish liability. Only then would I direct the district judge to determine the questions set forth by the majority.
 
 
 42
 It is likely that the issue separating me from the majority will not long remain unresolved. The Supreme Court has granted certiorari in Davis v. County of Los Angeles, 566 F.2d 1334 (9th Cir. 1977). First among the issues upon which certiorari was requested is whether plaintiffs, in a discrimination suit brought under Section 1981, must show that the defendants intended to discriminate against them. --- U.S. ----, 98 S.Ct. 3087, 57 L.Ed.2d 1132 (No. 77-1553, June 20, 1978). Because the case at bar is to be decided without awaiting the resolution of the Ninth Circuit's ruling, I would hold we are bound by Nevett.
 
 
 
 *
 District Judge of the Northern District of Georgia, sitting by designation
 
 
 [1]
 Section 14-166 of the DeKalb County Code provides that insubordination and failure to cooperate are grounds for dismissal
 
 
 [2]
 Williams appealed his discharge to the DeKalb County Merit System, which upheld Humma's action
 
 
 [3]
 Of course, a trial court should normally be warranted in accepting as true any simple statements of fact contained in documents presented by counsel. Here, this reliance was misplaced
 
 
 [4]
 This language was also taken from defendants' supplementary brief. It is unsupported in the record
 
 
 [5]
 We do not read Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), as holding that a plaintiff in an employment discrimination suit brought under 42 U.S.C. § 1981 must prove intentional discrimination. We agree with the reasoning of the Court of Appeals for the Ninth Circuit which rejected that argument in Davis v. County of Los Angeles, 566 F.2d 1334 (9th Cir. 1977), cert. granted, --- U.S. ----, 98 S.Ct. 3087, 57 L.Ed.2d 1132 (1978). We also note that the Supreme Court in Washington v. Davis decided the statutory issues against the plaintiffs there without discussing purpose or intent. The portion of the opinion dealing with the statutory cause of action discussed only the adequacy of the validation of the employment test. The Supreme Court would not have needed to resolve the validation issue if the statutory claims had also required, along with the constitutional claim, proof of purposeful discrimination. The fact that the Court found it necessary to decide the adequacy of the validation in order to resolve the statutory claims demonstrates that the infirmity of the plaintiffs' constitutional ground did not control the outcome of their statutory claims
 Nor do we construe Nevett v. Sides, 571 F.2d 209 (5th Cir. 1978), as requiring proof of intentional discrimination in this case. In Nevett we held that a showing of intentional discrimination was necessary in a racially based voting dilution claim founded on the fourteenth and fifteenth amendments. The holding was based expressly upon a consideration of those two amendments, 571 F.2d at 215.