Dana I. KESTENBAUM,
Plaintiff-Appellee,

v.

FALSTAFF BREWING
CORPORATION,
Defendant-Appellant.

No. 74–1878.

United States Court of Appeals,
Fifth Circuit.

June 16, 1975.

As Amended on Denial of Rehearing and
Rehearing En Banc Oct. 15, 1975.

David B. Kultgen, Waco, Tex., Max Hendrick, III, Houston, Tex., for defendant-appellant.

Jack N. Price, Longview, Tex., Ed P. Magre, Cameron, Tex., for plaintiff-appellee.

Before GOLDBERG, CLARK and GEE, Circuit Judges:

CLARK, Circuit Judge:

This is an appeal by the defendant, Falstaff Brewing Corporation, from a jury verdict in favor of the plaintiff, Dana I. Kestenbaum, in a civil antitrust suit brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover damages to Kestenbaum's business as a wholesale distributor of Falstaff Beer.

The Kestenbaum distributorship was begun in 1934 by Dana Kestenbaum's father, Sam Kestenbaum, and originally encompassed within its area of primary responsibility Milam, Robertson, Burleson, Brazos, Falls and Bell counties, Texas. Prior to the years at issue in this controversy, Bell and Falls counties were transferred to other distributorships. Dana Kestenbaum became an active partner in the distributorship in 1950. He was in complete control from 1967 until he sold the distributorship in 1971, allegedly because he could no longer financially endure Falstaff's anticompetitive practices. Actually, Kestenbaum sold the distributorship territory in three separate transactions, again allegedly under duress, with Milam county going to Falstaff's Taylor, Texas distributor, Robertson county to Falstaff's Marlin, Texas distributor, and Burleson and Brazos counties to Kestenbaum's former manager.

At trial Kestenbaum asserted Falstaff had violated Section 1 of the Sherman Act, 15 U.S.C. § 1. More particularly, he charged them with: (1) price fixing, (2) employing territorial restrictions on the resale of Falstaff beer, (3) participation in a general combination and conspiracy in restraint of trade, and (4) placing restraints on his sale of the distributorship.[1] From a jury award of 60,517.00 dollars, trebled by the trial court to 181,551.00 dollars, Falstaff has perfected this appeal.

In this court, Falstaff excepts to the trial court's charge, challenges the sufficiency of the proof of damage and questions the method employed to measure damages. The record does establish error in regard to some of Kestenbaum's contentions. The trial court having chosen not to utilize the special verdict procedure of Fed.R.Civ.P. 49(a), which would have revealed the jury's resolution of the various theories of liability advanced,[2] we are left with no alternative

---

1. Kestenbaum charges that Falstaff, through its franchise agreement with him and its superior economic position: (a) imposed territorial restrictions by denying him the right to sell to retail establishments outside his four-county franchise area; (b) fixed the prices at which he sold beer to retail accounts and arbitrarily raised its price to him by one-half of all wholesale price increases he instituted pursuant to its directives; (c) periodically required him to participate in price promotions by directing that he sell at a specified discount off regular price and stand one-half of the loss resulting from the discounted price; (d) required him to maintain unnecessary warehouse facilities in Caldwell and Cameron, Texas in furtherance of its market allocation policy; (e) required him to participate in unnecessary bar spending and advertising promotions; (f) made unwarranted criticisms and threats of termination if he did not follow its directives; and (g) re-

quired that he sell his distributorship at a price set by Falstaff.

2. *See* Brown, Federal Special Verdicts: The Doubt Eliminator, 44 F.R.D. 245 at 338 (1967); Ford Motor Co. v. Dallas Power & Light Co., 499 F.2d 400, 412 n. 19 (5th Cir. 1974); Simmons v. King, 478 F.2d 857, 862 n. 12 (5th Cir. 1973); Boyce v. Pi Kappa Alpha Holding Corp., 476 F.2d 447, 453 (5th Cir. 1973) (Brown, C. J., concurring); Wolfe v. Virusky, 470 F.2d 831, 837 (5th Cir. 1972) (Brown, C. J., concurring); Burns v. Anchor-Wate Co., 469 F.2d 730, 734 n. 8 (5th Cir. 1972); In re Double D. Dredging Co., Inc., 467 F.2d 468, 469 n. 3 (5th Cir. 1972); Little v. Bankers Life & Cas. Co., 426 F.2d 509, 512 (5th Cir. 1970) (Brown, C. J., concurring); Horne v. Georgia Southern & Florida Ry. Co., 421 F.2d 975, 980 (5th Cir. 1970) (Brown, C. J., concurring).

**694**

but to reverse and remand the entire proceeding.

## I

In *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 20, (5 Cir.) rehearing en banc denied, 496 F.2d 878 (5 Cir.), cert. dismissed, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974), we stated: "In order to recover treble damages under Section 4 of the Clayton Act, [plaintiff must] prove a violation of the antitrust laws by the defendants, an injury to his business resulting from the defendants' wrongful actions, and some indication of the amount of the damage done." *See Hobart Bros. Co. v. Malcolm T. Gilliland, Inc.,* 471 F.2d 894, 901–902 (5th Cir.), cert. denied, 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150 (1973); *Shaw v. Mobile Oil Corp.,* 60 F.R.D. 566, 568 (D.N.H.1973). Kestenbaum failed the second of this three-pronged test, *i. e.,* he failed to prove an injury to his business resulting from the defendants' asserted price-fixing actions. Thus, the trial court erred in submitting the issue of price fixing to the jury.

According to Kestenbaum's testimony, at all times while he was a distributor Falstaff fixed the prices at which he sold beer to retail accounts. Until about 1966, this price fixing allegedly consisted of instructions to distributors directing that predetermined prices be instituted at specified times. During the period from 1966 until 1971 when Kestenbaum sold his distributorship, Falstaff allegedly indirectly controlled his prices by instructing him to stay competitive with other local or "popular" brands.[3] With this directive to remain competitive, Falstaff instituted a policy of automatically raising its selling price to Kestenbaum by one-half of the amount of any price increase imposed by him in adherence to Falstaff's "stay competitive" requirement. Kestenbaum claimed that this latter price-fixing scheme damaged him in the one-half increase amounts Falstaff was assessing him under its automatic price increase policy. He admitted at trial however, that he would have remained competitive in the absence of any coercion by Falstaff. The evidence further disclosed that several other Falstaff distributors who attempted to go higher than the popular price level were met with drastic reductions in sales.

Kestenbaum submits that although it is true that he would have stayed competitive with popular brands even without a directive from Falstaff, when Falstaff's requirement that he do so was coupled with its taking of one-half of all additional revenue from his price increases on retail accounts, a situation was created in which he was not free to realize the percentage of profit that could have been attained absent this requirement. To reason that the amount of this diminished profit established any measure of antitrust damage is a non sequitur in today's case. While Falstaff's increase in price to Kestenbaum may be classified as arbitrary, such increase is not itself violative of the antitrust laws, nor does it afford a basis for proof of injury even though it is coupled with a price ceiling requirement which is a *per se* violation. A prerequisite to Kestenbaum's recovery on this issue was a showing that the price ceiling on sales by him, disregarding the price charged to him, caused injury. Not only did he fail to prove this, he established that the wholesale price which Falstaff allegedly fixed was a proper price. While the fact of injury often involves evidentiary questions which are properly for the jury [*e. g.,* Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544, 548 (1931)], no jury issue exists where, as here, the plaintiff fails to offer any competent evidence to establish that the defendant's wrongful price-fixing activity produced injury to him.

Even if Kestenbaum had not admitted that the "stay competitive" policy was logical and proper, and had

---

3. *E. g.,* Pearl, Lone Star and Jax. Other brands, such as Schlitz and Budweiser, were designated "premium" beers and sold at a slightly higher price than popular beers.

proffered evidence indicating that requiring him to meet the prices of other similar products caused him injury, this claim still would be deficient for failure to meet *Terrell's* third requirement— that the proof give some indication of the extent of the injury. Kestenbaum claims his damages were 25,000 dollars, the sum of Falstaff's increased selling price to him, based upon one-half of all of his increases to retailers. Under the facts shown in this case, Falstaff did not violate any antitrust stricture by raising its price to its wholesalers. Kestenbaum, therefore, by introducing only the 25,000 dollar calculation to support his claim for damages for wholesale price fixing, has failed to offer any competent evidence on the amount of damage. We recognize that leniency should be permitted in showing damages in private antitrust actions, however, a damage assessment based wholly on speculation and guesswork is improper. *E. g.,* Bigelow v. RKO Pictures, 327 U.S. 251, 264–65, 66 S.Ct. 574, 579–80, 90 L.Ed. 652 (1946). Because proper proof of injury and of damage was missing, the district judge should have directed a verdict for defendant on this aspect of plaintiff's price-fixing claim. If the jury calculated any part of its damage award on the sum of Falstaff's price increases to Kestenbaum, it was error. Under the enigmatic general verdict we cannot know whether they did or not, so the verdict cannot stand.

■ Plaintiff also attacks Falstaff's price promotions, in which he sold Falstaff beer at a discount, as a type of price-fixing scheme. Again plaintiff has failed to meet his burden of establishing a net economic loss. Having admitted that he would have participated in some such promotions voluntarily as a matter of sound business practice, it was incumbent upon Kestenbaum to reveal what proportion of the total costs were attributable to such voluntary promotions. Without such proof a jury could not compute the amount of loss recoverable on a basis other than mere speculation and guesswork. Bigelow v. RKO Pictures, *supra.*

■ Kestenbaum cites Perma Life Mufflers, Inc., v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), as authority for the proposition that he has the right to recover all costs incurred in price-fixing promotions regardless of whether he was compelled to participate, or participated voluntarily. *Perma Life* will not support such a broad rule. While the Supreme Court did hold that an injured party may not be denied any recovery merely because he has participated to the extent of utilizing illegal arrangements formulated and carried out by others, it went on to say that by-products of a restriction inuring to a plaintiff's benefit can be considered in computing damages. *Id.* at 140, 88 S.Ct. 1985.[4] Proof of the extent of this benefit is precisely what was lacking here.

## II

■ The trial court erred in instructing the jury that if they found that Falstaff dictated the sale price of Kestenbaum's distributorship, Falstaff would be guilty of a *per se* violation of

4. We would also note that *Perma Life* expressly pretermitted deciding whether complete involvement in and voluntary support of a monopolistic scheme might bar an antitrust cause of action. Our conclusion that *Perma Life* was *not intended to completely exclude* the element of voluntariness as a defense to an antitrust claim accords with decisions from other circuits. Premier Electrical Constr. Co. v. Miller-Davis Co., 422 F.2d 1132, 1138 (7th Cir. 1970), interpreted *Perma Life* to hold that only those plaintiffs "who do not bear equal responsibility for creating and establishing an illegal scheme, or who are required by economic pressures to accept such an agreement, should not be barred from recovery simply because they are participants." Columbia Nitrogen Corp. v. Royster Co., 451 F.2d 3, 15–16 (4th Cir. 1971), citing *Perma Life* and *Premier Electrical,* concluded that a party who voluntarily formulates and equally participates in a non-coercive agreement restraining trade cannot maintain a § 1 Sherman Act action against its partner.

the antitrust laws.[5] The *per se* rule was judicially created to deter agreements or practices constituting unreasonable restraints on trade, having such a pernicious effect on competition and so lacking in any redeeming virtue that a declaration of illegality could be made without elaborate inquiry into the precise harm they cause or the business excuse for their use. *E. g.,* United States v. Topco Associates, Inc., 405 U.S. 596, 607, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972); White Motor Co. v. United States, 372 U.S. 253, 262, 83 S.Ct. 696, 701, 9 L.Ed.2d 738 (1963); Northern Pacific R. R. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Under the particular facts of the case sub judice, where the price fixer must extend the very distribution-rights privilege which gave Kestenbaum's business its value, any restraint legitimately imposed to safeguard that privilege does not have such a deleterious impact as to create illegality as a matter of law. Rather, this type of situation necessitates an inquiry into the business purpose and reasonableness of the restraint employed, and must be measured under the rule of reason standard.

■■■■ It is beyond question, and the trial judge correctly so charged, that Falstaff may legitimately restrict the class of persons with whom it would agree to continue a Falstaff franchise, so long as such restriction was not artificially employed to further some unlawful practice. *E. g.,* United States v. Arnold Schwinn & Co., 388 U.S. 365, 376, 87 S.Ct. 1856, 1864, 18 L.Ed.2d 1249 (1967); United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). A refusal to deal becomes illegal under the Sherman Act only when it produces an unreasonable restraint of trade. *E. g.,* United States v. Parke, Davis & Co., 362 U.S. 29, 45–46, 80 S.Ct. 503, 512–13, 4 L.Ed.2d 505 (1960); Lorain Journal Co. v. United States, 342 U.S. 143, 155, 72 S.Ct. 181, 187, 96 L.Ed. 162 (1951); Kiefer-Stewart Co. v. Joseph E.

Seagram & Sons, 340 U.S. 211, 214, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951).

■■■■ It logically follows that Falstaff has a right to restrict the sales price of one of its distributorship franchises to the reasonable value of that franchise in order to insure that the purchaser will have a chance to realize a reasonable return on his investment. Falstaff clearly has a strong interest in the financial vitality of a new franchisee. If the purchaser of a franchise makes a bad bargain when he buys, then he cannot give the distributorship the solid, concerned management which it must have to be successful for him and to enhance Falstaff's image and relative position in the market.

A franchisor's limited right to participate in negotiations of a franchise sale has previously been recognized by this court in Frank Coulson, Inc.—Buick v. General Motors Corp., 488 F.2d 202 (5th Cir. 1974), a tort action to recover for interference in contractual negotiations. In *Frank Coulson, Inc.,* we held that an automobile manufacturer possessed a limited privilege to approve or disapprove a prospective purchaser since it would deal with the purchaser in the future and he would represent it to the public. This privilege further extends to the degree of control over the dealer's sale price necessary to ensure that the new dealer starts off financially sound. *Accord,* Pierce Ford Sales, Inc. v. Ford Motor Co., 299 F.2d 425, 429 (2nd Cir.), cert. denied, 371 U.S. 829, 83 S.Ct. 24, 9 L.Ed.2d 66 (1962); Martin v. Texaco, Inc., 304 F.Supp. 498, 502–504 (S.D.Miss. 1969).

■■■■ On retrial, the jury must decide whether Falstaff restrained the sale price which Kestenbaum could receive, and, if so, whether such restraint was adopted for good business reasons and not to injure competitors. The test of antitrust legality of such a restraint is whether the effect upon competition in the marketplace is substantially adverse. United States v. Arnold Schwinn & Co.,

---

**5.** See note 7 *infra.*

*supra.* Only those acts, contracts or agreements which unduly obstruct the due course of trade, or which injuriously restrain trade because of their inherent nature or effect, or because of their evident purpose are unlawful under the rule of reason. *E. g.*, United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1910).

### III

■ The trial court erred in submitting to the jury the issue of whether Falstaff was guilty of restraining sales to customers outside Kestenbaum's prescribed geographical area. It was improper to permit the jury to consider this aspect of territorial restriction since Kestenbaum failed to offer any proof of the extent of damage to his business proximately caused by such customer restraint. Kestenbaum's only proof relating to this issue was his testimony that on one occasion he had been reprimanded by Falstaff for selling to a retailer who resided outside his four-county territory, plus his testimony and that of several other witnesses that it was Falstaff's policy to restrict a distributor's sales to retailers located within the area covered by his franchise agreement. Kestenbaum never attempted to show the amount of monetary injury suffered because of loss of sales to retailers outside his territory—sales that reasonably would have been made but for Falstaff's territorial restriction policy.

. [17] Again, the rule of *Terrell* requires evidence which would provide a reasonable basis for estimating the extent of injury caused by such a territorial restriction. Erroneous inclusion of the customer restraint element in the court's charge despite the complete lack of damage proof may have been prejudicial to Falstaff, since this instruction could have been misinterpreted by the jury to authorize an award on Kestenbaum's separate claim for unnecessary warehouse costs.[6] Since both allegations were argued under the general territorial restriction claim, the jury may well have mistakenly awarded the amount of such unnecessary warehouse costs incurred *within* the assigned area upon a determination that Kestenbaum was wrongfully restrained from seeking customers *outside* of his allotted territory. The general verdict does not permit us to know whether this occurred.

While the composition and content of the charge is for the trial court in the first instance, we would observe that if Kestenbaum makes the requisite proof to entitle him to a charge on the imposition of unwarranted and unnecessary warehousing and distribution costs the damages attributable to such costs could be more easily understood if the measure of those damages were presented in a separate instruction on that subject. If such a charge is cast as a liability-damage unit it would minimize the risk of sowing seeds of confusion between damages claimed to have arisen from activity required within the territory assigned (unnecessary warehouse costs) and activity proscribed without the territory (soliciting customers in other counties). Because these two elements have a surface sameness, care should be taken to preserve their truly separate nature. Such an approach would also minimize the hazard that double damages would be awarded. Such a hazard is suggested since we note that plaintiff's counsel not only was allowed to argue Falstaff's alleged unnecessary warehouse costs as damages resulting from territorial allocation but also pointed to such damages as caused by a general combination and conspiracy in restraint of trade.

### IV

Falstaff asserts that Kestenbaum's personal assessment of the good will val-

---

**6.** Kestenbaum testified Falstaff's requirement that he maintain warehouse facilities in Caldwell, Cameron and Bryan, rather than just one warehouse in Bryan as he requested, caused the unnecessary stockpiling of inventory, thereby increasing interest, expense, insurance, transportation costs, and expenditures. Kestenbaum assessed his damages for this alleged violation at 49,115.05 dollars.

ue of his distributorship forms an insufficient basis to support a jury verdict. Kestenbaum retorts that his testimony is supported by the long history of the distributorship, additional testimony concerning the good will created during the distributorship's many years of operation and documentary evidence of the profits realized during those years. This supporting evidence, he contends, is sufficient to establish a reasonable foundation for his opinion on the good will of the business.[7]

In light of our decision to remand on other grounds it is unnecessary for us to rule on the sufficiency of plaintiff's proof of damage from a restriction on distributorship sale price. However, since the issue must be relitigated it is appropriate to speak to the general rules which govern its proper disposition.

██ In a case such as this, where the wrong is of such a nature as to preclude exact ascertainment of the amount of damages, plaintiff may recover upon a showing of the extent of the damages as a matter of just and reasonable inference, although the result may be only an approximation. Story Parchment Co. v. Paterson Parchment Paper Co., *supra* 282 U.S. at 563, 51 S.Ct. at 250. The wrongdoer may not complain of inexactness where his actions preclude precise computation of the extent of the injury. Eastman Kodak Co. v. Southern Photo Co., 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927). An award may not be based, however, solely upon speculation or guesswork. Bigelow v. RKO Radio Pictures, Inc., *supra* 327 U.S. at 267, 66 S.Ct. at 580. *See also* Terrell v. Household Goods Carriers' Bureau, *supra* at 23–24.

██ The specific elements to be considered in calculating the "good will" value of a business are: "(1) What profit has the business made over and above an amount fairly attributable to the return on the capital investment and to the labor of the owner?; (2) What is the reasonable prospect that this additional profit will continue into the future, considering all circumstances existing and known as of the date of the valuation?" Standard Oil Co. v. Moore, 251 F.2d 188, 219 (9th Cir. 1957), cert. denied, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958); Simpson v. Union Oil Co., 411 F.2d 897, 909 (9th Cir.) rev'd on other grounds, 396 U.S. 13, 90 S.Ct. 30, 24 L.Ed.2d 13 (1969); Central Coal and Coke Co. v. Hartman, 111 F.2d 96, 98–99 (8th Cir. 1901); Vandervelde v. Put and Call Brokers and Dealers Ass'n, 344 F.Supp. 118 (S.D.N.Y. 1972).

 We cannot know whether the new Federal Rules of Evidence will control relitigation of this case. *See* Preamble, Pub.Law 93–595, 88 Stat.1926 (Jan. 2, 1975).[8] However, whether present evidentiary rules or the new Federal Rules are applied, Kestenbaum's estimation of the sum of the above valuation elements will be admissible since under both an owner is competent to give his opinion on the value of his property. This rule, established by the weight of present authority, [*e. g.,* Berkshire Mutual Ins. Co. v. Moffett, 378 F.2d 1007 (5th Cir. 1967); Lee Shops, Inc. v. Schatten-Cypress Co., 350 F.2d 12 (4th Cir.), cert. denied, 382 U.S. 980, 86 S.Ct. 552, 15 L.Ed.2d 470 (1965); Hartford Fire Ins. Co. v. Cagle, 249 F.2d 241 (10th Cir. 1957); Lawton v. Strong, 249 F.2d 299, 302 (6th Cir. 1957); Universal Pictures Co. v. Harold Lloyd Corp., 162 F.2d 354 (9th Cir. 1947)[9]] has

7. Kestenbaum placed the good will value of his distributorship at 49,000 dollars. Falstaff, on the other hand, had approximated the good will value at 25,000 dollars. With Falstaff's approval, Kestenbaum ultimately sold the distributorship for a total consideration of 30,000 dollars above the value of assets and inventory.

8. The new Federal Rules of Evidence become effective on July 1, 1975, and apply to all proceedings then pending, "except to the extent that application of the rules would not be feasible, or would work injustice, in which event former evidentiary principles apply."

9. Under Rule 43(a) Fed.R.Civ.P., which provides that a federal court must judge the competency of a witness by the federal statute, federal rule or state rule of the forum state depending on which favors the reception of the evidence, a federal district court sitting in

now been codified in Rule 702 of the new Federal Rules of Evidence. Rule 702 provides: "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify [to specialized knowledge] in the form of opinion or otherwise."[10]

 An owner's opinion on value, however, is subject to attack through cross-examination or independent evidence refuting the owner's estimate [Hillin v. Hagler, 286 S.W.2d 661 (Tex.Civ. App.1956)], with the jury as fact-finder shouldering the responsibility of judging the credibility of the witness, resolving the conflicting evidence, and assessing the weight of opinion testimony. *Terrell, supra* at 24; Hobart Brothers Co. v. Malcolm T. Gilliland, Inc., *supra* at 903. Under certain circumstances, however, for instance where the owner bases his estimation solely on speculative factors, the owner's testimony may be of such minimal probative force to warrant a judge's refusal even to submit the issue to the jury. Klapmeir v. Telecheck International, Inc., 482 F.2d 247 (8th Cir. 1973); United States v. Nall, 437 F.2d 1177, 1187 (5th Cir. 1971).

## V

 Finally, Kestenbaum asserts that it is no longer necessary in a private antitrust action to prove "public injury" (injury to competition) as a prerequisite to recovery under a general combination and conspiracy in restraint of trade complaint. To the extent he asserts that a

plaintiff in a private antitrust action need only show that the restraint tends or is reasonably calculated to prejudice the public interest, Kestenbaum is correct. Such a plaintiff is not required to shoulder the more onerous burden of proving specific economic injury to competition. In Rogers v. Douglas Tobacco Bd. of Trade, Inc., 266 F.2d 636, 644 (5th Cir. 1959), we stated: "That does not mean that specific public injury must be proved before a private person can recover; but before it can be said that the conduct is forbidden as *unreasonably* restraining trade or commerce within the meaning of the Sherman Antitrust Act it must appear that it *tends* or is *reasonably calculated* to prejudice the public interest." (Emphasis in original.) *Accord,* Schaffer v. Universal Rundle Corp., 397 F.2d 893, 897 (5th Cir. 1968); Cherokee Laboratories, Inc. v. Rotary Drilling Services, Inc., 383 F.2d 97, 104 (5th Cir. 1967); Lamb Enterprises, Inc. v. Toledo Blade Co., 461 F.2d 506 (6th Cir. 1973).

 Kestenbaum presses his theory beyond this, to the point of asserting that to recover under a restraint of trade claim a plaintiff need only show a violation of the antitrust laws and damage to himself. With this we cannot agree. Kestenbaum founds this broad contention upon the Supreme Court's holdings in Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957) and its progeny.[11]

The thrust of these decisions is most succinctly stated in Radiant Burners,

---

Texas must apply the majority rule since it is the rule in Texas. *E. g.,* National Surety Corp. v. Seale, 499 S.W.2d 753 (Tex.Civ.App.1973) ("The testimony of the owner that he knows the value of the property is sufficient, at least prima facie, to qualify him to give an opinion."); Graves v. Trevino, 386 S.W.2d 831, ref. n. r. e. (Tex.Civ.App.1965); Fluitt v. Valley Stockyards Co., 384 S.W.2d 917, ref. n. r. e. (Tex.Civ.App.1964). More particularly, that such testimony is admissible in Texas on the issue of good will would appear beyond question in light of the holding in Scott v. Doggett, 266 S.W.2d 183, ref. n. r. e. (Tex.Civ.App. 1950), that the rule for measuring damages to good will is the same as that for measuring damages to any other property.

**10.** The Advisory Committee on Federal Rules of Evidence has construed Rule 702 (Testimony by Experts) to include "not only experts in the strictest sense of the word, e. g. physicians, physicists, and architects, but also the large group sometimes called "skilled" witnesses, such as bankers or landowners testifying to land values."

**11.** In re McConnell, 370 U.S. 230, 231, 82 S.Ct. 1288, 1290, 8 L.Ed.2d 434 (1962); Poller v. Columbia Broadcasting System, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); Radiant Burners, Inc. v. Peoples Gas Light and Coke Co., 364 U.S. 656, 660, 81 S.Ct. 365, 367, 5 *L.Ed.2d* 358 (1961); Klors, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 211, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959).

Inc., v. Peoples Gas Light & Coke Co., 364 U.S. 656, 660, 81 S.Ct. 365, 367, 5 L.Ed.2d 358 (1961):

> By § 1, Congress has made illegal: "Every contract, combination * * * or conspiracy, in restraint of trade or commerce among the several States * * *." Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 515, 55 L.Ed. 619. Congress having thus prescribed the criteria of the prohibitions, the courts may not expand them. Therefore, to state a claim upon which relief can be granted under that section, allegations adequate to show a violation and, in a private treble damage action, that plaintiff was damaged thereby are all the law requires.

An analysis of the facts in these cases demonstrates that the requirement that no more than individual injury be shown has been applied only in private antitrust actions alleging *per se* violations or actions based upon restraint of trade *and* monopolization. Our conclusion that the rule is not universal is buttressed by the Supreme Court's more recent decision in Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 708, 82 S.Ct. 1404, 1415, 8 L.Ed.2d 777 (1962), where, *after* finding that all practices complained of were *per se* violations, the court held that the trial court's "public injury" charge was erroneous. *See* Arthur Murray, Inc. v. Reserve Plan, Inc., 406 F.2d 1138, 1145 (8th Cir. 1969). Also supportive is the Sixth Circuit's holding in Lamb Enterprises, Inc., *supra* at 517, that where there is no *per se* violation it must be determined whether the activity complained of unreasonably restrains trade, *i. e.,* is reasonably calculated to prejudice the public interest. *But see* Syracuse Broadcasting Corp. v. Newhouse, 295 F.2d 269, 276–77 (2nd Cir. 1961).

Today's resolution of the public injury issue accords with our prior holding in Harrison v. Prather, 435 F.2d 1168, 1176 (5th Cir. 1970). There, faced with plaintiff Harrison's private conspiracy in restraint of trade claim, we stated that:

"the proposition that recovery is possible if an individual proves purely personal damages, does not establish the necessary element of restraint of commerce. Harrison's authorities consist entirely of per se violation cases or cases involving activities which by their nature and character had a monopolistic tendency."

Reversed and remanded.