### EASTERN DENTAL CORPORATION
#### v.
### ISAAC MASEL CO., INC.

Civ. A. No. 78–3790.

United States District Court,
E. D. Pennsylvania.

Dec. 22, 1980.

Robert Costigan, Philadelphia, Pa., for plaintiff.

G. David Rosenblum, Philadelphia, Pa., for defendant.

## OPINION

LUONGO, District Judge.

Plaintiff, Eastern Dental Corporation (EDC), is a distributor and manufacturer of products used exclusively in the practice of orthodontics. Defendant, Isaac Masel Co., Inc. (Masel), is a manufacturer and distributor of dental products and instruments.

From the time of EDC's incorporation, Masel supplied it with certain of the products Masel manufactured. On August 10, 1978, Masel informed EDC that it would no longer supply its products to EDC. Contending that this refusal to continue to supply constituted a violation of § 2 of the Sherman Act, 15 U.S.C. § 2, EDC brought suit seeking treble damages and injunctive relief under the Clayton Act. *See* 15 U.S.C. §§ 15 & 26. EDC asserts additional claims (1) that the termination of the business relationship between the parties was in breach of a requirements contract and (2) that defendant had supplied defective merchandise in breach of a warranty of merchantability. On all three counts plaintiff claims damages to its business, including a claim for loss of goodwill.

Jurisdiction is based, as to the antitrust claim, on 28 U.S.C. § 1337, and, as to the breach of contract and breach of warranty claims, on diversity of citizenship. 28 U.S.C. § 1332(a).

Before me is defendant's motion for partial summary judgment on the antitrust claims, the breach of contract claim and on the issue of whether or not damages for loss of goodwill are recoverable if plaintiff is successful on any one of the three counts of the complaint.

## I. BACKGROUND

EDC was incorporated in December of 1973 for the purpose of distributing products used exclusively in the practice of orthodontics, in particular, disposable orthodontic products, "the braces and the wires and the auxilliary items that go around the fixed appliances."[1] Masel is a manufacturer and distributor of dental products and instruments including those considered to be disposable orthodontic products and instruments. Masel markets its products wholesale through sales to distributors, and retail through direct sales to dentists and orthodontists.

Around the time of EDC's incorporation, its President, Vincent Santulli, and its Vice-

---

[1]. Deposition of H. Neil Miller, October 24, 1979, at 12 (hereinafter Miller Deposition).

President and Secretary-Treasurer, H. Neil Miller, began a series of discussions with Jacob J. Masel, the President of defendant, Isaac Masel Co., Inc., concerning the sale of Masel's disposable orthodontic products and instruments to EDC for resale to retail purchasers. As a result of these discussions Masel began to sell a product known as facebows to EDC. Eventually, Masel added what are known as elastics, lingual buttons, cleats, and metal bases to the line of products that it sold to EDC. Pursuant to their negotiations, Masel manufactured and sold to EDC at a wholesale price (the price which Masel charged distributors) products which were resold under EDC's label.[2] In addition, since EDC was a new company, Masel granted it advantageous credit terms. During the course of the four year relationship, the parties operated without a written agreement, doing business solely through invoices and statements.

Beginning in late 1976, EDC began to receive many customer complaints concerning breakage of the facebows manufactured by Masel. These complaints of defective facebows are the basis for EDC's breach of warranty count in which EDC seeks to be compensated for loss of customers and goodwill.

In July of 1977, EDC began to manufacture elastics, a product it had theretofore purchased from Masel. Later, in September of 1977, Miller informed Masel that a firm known as Star Dental Company had expressed an interest in acquiring EDC. A meeting took place between Jacob Masel, his son Robert, and Miller and Santulli, concerning the possibility of Masel acquiring EDC.[3] Although Jacob Masel made a proposal to Miller and Santulli, no written offer was ever made. In any event, the possibility of a Masel takeover never left the preliminary negotiation stages as the EDC shareholders rejected the entire concept of the Masel proposal.[4]

In March of 1978 EDC submitted a purchase order which was not filled. Eventually, on August 10, 1978, Masel sent a letter to EDC advising that Masel was too busy to handle accounts like EDC's profitably, and that it was therefore terminating their relationship.

When it was cut off, EDC attempted to find alternative sources of supply for Masel products. It was unable to find a source for either facebows or metal bases at wholesale prices. While it did find an alternative source of buttons and cleats, it made the business decision not to purchase those items because the price was prohibitive. As of the date of the filing of the complaint, EDC was no longer selling metal bases, cleats, or buttons. It did, however, sell facebows, a product which it has been manufacturing itself since January, 1979.

## II. THE ANTITRUST CLAIMS

Section 2 of the Sherman Act provides that it is unlawful for any person to "monopolize or attempt to monopolize ... any part of the trade or commerce among the several States...." 15 U.S.C. § 2. As the statute makes clear, monopolization and attempts to monopolize are two distinct offenses under the Act. *Buckeye Powder Co. v. E. I. DuPont de Nemours & Co.*, 166 F. 514 (D.N.J.1912) *aff'd* 248 U.S. 55, 39 S.Ct. 38, 63 L.Ed. 123 (1918). Although not absolutely clear from the complaint, EDC is contending that Masel has committed both of these offenses.

Plaintiff claims that Masel refused to sell its products to EDC in retaliation for EDC's decision to manufacture elastics, and that Masel's decision was motivated by its desire to create or extend a monopoly in the business of manufacturing dental products/instruments and in an attempt to monopolize the business of manufacturing dental products/instruments. In addition, EDC asserts that Masel intended to substantially lessen competition in both the

---

2. Deposition of Edith J. Masel, October 25, 1979, at 16 (hereinafter Masel Deposition).

3. Miller Deposition at 127; Masel Deposition at 84.

4. Miller Deposition at 129.

retail and manufacturing markets by eliminating plaintiff as a competitor. Masel, on the other hand, contends that it terminated its relationship with EDC because of problems concerning the defective facebows and EDC's failure to live up to its financial obligations.

I will consider each of the purported antitrust claims separately. At the outset, it should be noted that although summary judgment should be granted sparingly in antitrust cases, *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1961), to avoid the entry of summary judgment the non-moving party must still "come forward with affidavits setting forth specific facts showing that there is a genuine issue for trial." *Harold Friedman, Inc. v. Kroger Company*, 581 F.2d 1068, 1080 (3d Cir. 1978), *quoting, Tripoli Company v. Wella Corp.*, 425 F.2d 932, 935–36 (3d Cir.) (en banc), *cert. denied*, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970). *See* F.R.Civ.P. 56.

### A. *Monopolization*

The offense of monopolization requires that the plaintiff establish that the defendant (1) possesses monopoly power in the relevant market, and (2) has "willfully acquired or maintained that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinell Corporation*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *United States v. Griffith*, 334 U.S. 100, 106–07, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1946). Defendant asserts that EDC has failed to come forward with facts showing that there is a genuine issue as to whether either of the above elements is present in this case. It contends, therefore, that it is entitled to summary judgment on the monopolization claim.

### 1) *Monopoly Power*

Monopoly power exists when the defendant has "the power to control prices or exclude competition" in the relevant market. *United States v. DuPont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956); *Columbia Metal Company, Inc. v. Kaiser Aluminum & Chemical Corporation*, 579 F.2d 20, 26 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978). The threshold determination which must be made before monopoly power is assessed, therefore, is the definition of the relevant product and geographic markets. *United States v. Grinell, supra*, at 571, 86 S.Ct. at 1704; *United States v. Columbia Steel Co.*, 334 U.S. 495, 527, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533, *rehearing denied*, 334 U.S. 862, 68 S.Ct. 1525, 92 L.Ed. 1781 (1948). This determination is often crucial as the presence of monopoly power can be inferred if the defendant is in possession of a predominant share of the relevant market. *United States v. Grinell, supra*, at 571, 86 S.Ct. at 1704.

In the instant case the parties agree that the relevant geographic market is the United States. As to the relevant product market, however, the parties are in complete disagreement.

There are approximately four major and eight minor manufacturers of disposable orthodontic products in the United States. Masel and EDC are considered to be among the minor manufacturers in this industry. In addition to the twelve firms in the United States there are three foreign firms, two German and one Japanese, which manufacture orthodontic products.

Of all the firms mentioned above, only the four major domestic firms carry a complete line of disposable orthodontic products for sale. No firm manufactures every disposable orthodontic product itself; every firm in the industry carries products manufactured by other firms. It is undisputed that, at the time this action was commenced, Masel had less than 1% of the entire market and less than 1% of the market for any individual product in the entire disposable orthodontic product market.

It is EDC's contention, however, that although Masel produced less than 1% of the facebows in the United States, Masel was the only manufacturer which sold facebows

to distributors at wholesale prices. Further, it asserts that Masel facebows were so unique that no substitutes existed for that product. Accordingly, plaintiff contends that the relevant product market is the market for the sale of facebows at wholesale prices or in the alternative, Masel facebows. EDC alleges that since Masel was the only manufacturer which sold facebows at wholesale prices, it had 100% of that market. Clearly, the existence of monopoly power can be inferred from 100% share of the relevant market. *See, e. g., United States v. Aluminum Co. of America*, 148 F.2d 416, 429 (2d Cir. 1945); *Yoder Brothers, Inc. v. California-Florida Plant Corporation*, 537 F.2d 1347, 1367 (5th Cir. 1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977); *Smith Kline v. Eli Lilly & Company*, 575 F.2d 1056–1065 (3d Cir.), *cert. denied*, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978).

To the contrary, Masel contends that, at its narrowest, the relevant product market consists of "those disposable orthodontic products which EDC purchased from Masel," to wit, elastics, facebows, lingual buttons and cleats and metal bases."[5] It is undisputed that Masel had less than 1% of this market, a share clearly insufficient, as a matter of law, to allow a finding of monopoly power. *See Yoder Brothers, Inc. v. California-Florida Plant Corporation, supra*, at 1367.

Accordingly, unless EDC has set forth sufficient facts to create a genuine issue as to whether or not sales of facebows at wholesale prices constitute the relevant product market, defendant's motion must be granted, at least insofar as the element of monopoly power is concerned.

■ The relevant product market consists of those products which are either reasonably interchangeable with each other or show cross-elasticity of demand for each other. *Brown Shoe Company, Inc. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1961); *United States v.*

*E. I. DuPont de Nemours & Co., supra*, at 404, 76 S.Ct. at 1012; *Columbia Metal Culvert Company, Inc. v. Kaiser Aluminum & Chemical Corporation, supra*, at 28.

If this alone were the test, EDC has not raised a genuine issue of fact as to the existence of a wholesale facebow market. It concedes in its answers to interrogatories that Masel facebows are reasonably interchangeable with products produced by other manufacturers. Plaintiff's Answers to Interrogatories-Third Set, Nos. 29 and 30. Further, EDC has set forth no facts tending to establish that all facebows lack cross-elasticity of demand with each other among the ultimate consumers, the orthodontists.

The Supreme Court, however, has indicated that within the relevant product market, well defined submarkets may exist. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). *See Columbia Metal Culvert Company v. Kaiser Aluminum and Chemical Corp., supra*, at 26–27. "The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States, supra*, at 325, 82 S.Ct. at 1523.

■ A method of product distribution can be considered a relevant submarket for antitrust purposes. *See, e. g., Greyhound Computer Corporation, Inc. v. International Business Machines Corporation*, 559 F.2d 488, 494 (9th Cir. 1977); *Coleman Motor Co. v. Chrysler Corporation*, 525 F.2d 1338, 1348–49 (3d Cir. 1975). In *Greyhound*, the court held that because the computer industry recognized that there was a distinction between selling and leasing, there was sufficient evidence from which the jury could infer the existence of a submarket consist-

---

**5.** Memorandum of Law in Support of Defendant's Motion for Partial Summary Judgment, at 14.

ing of the *leasing* of general purpose digital computers.

■ In the instant case, plaintiff contends that, although the record indicates that disposable orthodontic products manufacturers marketed other products through sales to wholesale distributors, Masel was the only manufacturer which marketed facebows in this manner. Indeed, no manufacturer would sell facebows to EDC after the cutoff although they would sell it other products. There is testimony in the record that sales of facebows at wholesale prices created merchandising problems which were not present in direct retail sales.[6] From the above, a factfinder could infer that the industry recognized a wholesale facebow submarket. Thus, a genuine issue of fact exists as to whether such a market exists and whether Masel had monopoly power in that market.

■ EDC will not, however, be able to establish a relevant market based on a theory that Masel facebows are so unique that there were no available substitutes. There is no evidence in the record supporting this assertion. First, as plaintiff has conceded in its answers to interrogatories, other manufacturers' facebows are functionally interchangeable with Masel's.[7] Secondly, EDC's own conduct after Masel cut it off does not support its contention. EDC explored the possibility of obtaining facebows from other manufacturers. If EDC had been able to get them for a wholesale price, it would have purchased the facebows from other manufacturers. The lack of available substitutes for Masel facebows was not due to the functional uniqueness of Masel facebows but rather was due to the refusal of other manufacturers to supply similar facebows at a wholesale price. Thus, there is nothing in this record to support a finding that Masel facebows were so unique that that product constituted a relevant market in · and of itself. *See, e. g., Edward J. Sweeny & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105 (3d Cir. 1980); *Mogul v. General*

*Motors Corporation*, 391 F.Supp. 1305 (E.D. Pa.1975), *aff'd*, 527 F.2d 645 (3d Cir. 1976).

Accordingly, although plaintiff will not be able to prove the existence of a market consisting of Masel facebows alone, defendant is not entitled to summary judgment on the element of monopoly power because there is a genuine issue as to the existence of a wholesale facebow market. If plaintiff can establish such a market at trial, there is some evidence that defendant has a sufficient share of that market to support a finding that it has monopoly power.

2) *Willful Acquisition or Maintenance of Monopoly Power*

Masel also contends that if it had monopoly power in the wholesale market, the record indicates that it did not willfully acquire or maintain that power and therefore it is entitled to summary judgment on the monopolization claims.

■ This element of the offense of monopolization reflects the fact that the Sherman Act does not prohibit "monopoly in the concrete" but rather requires some type of anti-competitive conduct. *Standard Oil of New Jersey v. United States*, 221 U.S. 1, 62, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911); *Berkey Photo, Inc. v. Eastman Kodak Company*, 603 F.2d 263, 273–75 (2d Cir. 1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

The courts have held that the willful acquisition element is satisfied by the use of monopoly power in one market to create a monopoly in another market. The rationale being "[i]f monopoly power can be used to begat monopoly, the Act becomes a feeble instrument indeed." *United States v. Griffith*, 334 U.S. 100, 108, 68 S.Ct. 941, 946, 92 L.Ed.2d 1236 (1948); *Smith Kline Corp. v. Eli Lilly & Co., supra*, at 1065.

In dictum, the *Griffith* court indicated that not only is it a violation of section 2 for a party to use monopoly power to "begat" monopoly but section 2 is also violated when

---

6. Masel Deposition at 25.

7. Plaintiff's Answers to Interrogatories-Third Set, Nos. 29 and 30.

the "power, however lawfully acquired [is used] to foreclose competition, to gain a competitive advantage, or destroy a competitor . . . ." *United States v. Griffith, supra,* at 107, 68 S.Ct. at 945. Other courts have accepted this teaching and have held that section 2 is violated when monopoly power in one market is used as a lever in another. *See, e. g., Mid-Texas Communications Systems, Inc. v. American Telephone and Telegraph,* 615 F.2d 1372, 1386 (5th Cir. 1980); *Berkey Photo, Inc. v. Eastman Kodak Company, supra,* at 275; *Smith Kline Corp. v. Eli Lilly & Co., supra,* at 1065.

■ In the instant case, although EDC does not allege that Masel acquired its purported monopoly power illegally, it alleges that Masel has used that power to gain a competitive advantage in the orthodontic product/instrument manufacturing markets and retail markets.

On the record thus far adduced, there is a genuine issue as to Masel's motivation in effectuating the cutoff. There is evidence indicating that Jacob Masel was unhappy when he learned of EDC's decision to manufacture elastics in competition with Masel. EDC asserts that, in the first instance, Masel attempted to acquire EDC. When that failed, the cutoff followed. EDC contends that the cutoff, therefore, was a direct response to EDC's entry into this market and that the purpose of the cutoff was to eliminate EDC as a competitor in the elastics market. Thus, I cannot find, with the requisite degree of certainty, that Masel's cutoff of EDC was accomplished without anticompetitive motivation. Since summary judgment is especially improper in antitrust cases where questions of motive and intent are present, I must deny defendant's motion for summary judgment at least as to the monopolization claim. *See Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 71 L.Ed.2d 458 (1962).

### B. *Attempted Monopolization*

■ To succeed on a claim of attempted monopolization plaintiff must prove that defendant had (1) a specific intent to monopolize and (2) sufficient market power to come dangerously close to success. *Harold Friedman, Inc. v. Kroger Company,* 581 F.2d 1068, 1079 (3d Cir. 1978); *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338, 1348 (3d Cir. 1975).

Although it is not entirely clear from the complaint, plaintiff is seemingly contending that Masel attempted to monopolize three distinct submarkets. The submarkets are the dental product/instrument manufacturing market; the market for the retail sale of dental products/instruments; and the wholesale facebow market.

As to the first two markets mentioned above, plaintiff has failed to come forward with sufficient evidence to preclude the entry of summary judgment against it. The evidence in this record is abundantly clear that Masel had less than a 1% market share in any conceivable product market with the possible exception of the wholesale facebow market. In *Harold Friedman, Inc. v. Kroger, supra,* at 1080, the Third Circuit held that a supermarket chain, whose market share rose from 9.2% to 15.5% as an alleged result of anticompetitive conduct, did not have the requisite market power to come dangerously close to monopolizing the relevant market. Clearly, Masel, holding less than 1% of any market with the exception of the wholesale facebow market, does not have sufficient market power to come dangerously close to monopolizing these markets.

■ As indicated in my discussion of monopolization, however, if EDC can establish that a wholesale facebow market exists, then there is a genuine issue of fact as to whether Masel had a sufficient share of that market to have monopoly power. Similarly, there is a genuine issue of fact as to whether Masel had sufficient market power to come dangerously close to success in achieving monopolization. Further, whether or not Masel had the specific intent to monopolize when it cut off EDC presents a material issue of fact.

■ Accordingly, I must deny defendant's motion for summary judgment on the claim of attempted monopolization at least as to the wholesale facebow market. Plaintiff, however, has failed to establish that a genuine issue of fact exists as to whether Masel had sufficient market power to come dangerously close to succeeding in monopolizing any other market, and defendant's motion for summary judgment will be granted as to those claims.

### III. THE BREACH OF CONTRACT CLAIM

Masel contends that it is entitled to summary judgment on the breach of contract claim on the grounds (a) that the contract is not evidenced by a writing sufficient to satisfy the statute of frauds, Pa.Cons.Stat. Ann. tit. 13, § 2201 (Purdon Pamphlet 1980),[8] and (b) that requirements contracts which fail to state a specific time term are terminable at will by either party. *See id.,* §§ 2306 and 2309. For the reasons hereafter stated, defendant's motion for summary judgment on the breach of contract claim will be granted on the ground that the purported requirements contract does not satisfy the statute of frauds. In light of the resolution of that issue, it is unnecessary to consider the merits of defendant's argument that the contract is terminable at will.

Pennsylvania's version of the Uniform Commercial Code's Statute of Frauds provides in pertinent part:

(a) General rule.—Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in such writing.

*Id.* § 2201(a).

■ The statute of frauds' requirement of a writing is applicable to all contracts for the sale of goods for $500 or more, including requirements contracts. *See, e. g., Artman v. International Harvester Company,* 355 F.Supp. 482, 486 (W.D.Pa. 1972); *Weilersbacher v. Pittsburgh Brewing Co.,* 421 Pa. 118, 218 A.2d 806 (1966). The main purpose of the writing required by the statute of frauds is to "afford a basis for beliving (*sic*) that the offered oral evidence rests on a real transaction." *Harry Rubin & Sons v. Consolidated Pipe Company of America, Inc.,* 396 Pa. 506, 512, 153 A.2d 472 (1959). A writing which satisfies the requirements of the statute is only evidence of an agreement and does not necessarily prove the existence or terms of a contract. *Id.*

A writing satisfies the statute if it is (1) signed by the party to be charged, (2) evidences a contract for the sale of goods, and (3) specifies a quantity term. 12A Pa.Stat. Ann. § 2–201 (Purdons 1970) (repealed 1980) (Uniform Commercial Code Comment).[9] *See* J. White & R. Summers, Uniform Commercial Code § 2–4 at 51 (1972).

■ In output and requirement contracts the quantity of goods to be delivered

---

**8.** The parties, in their submissions, assumed that Pennsylvania law applies in the diversity aspects of this case. Since Pennsylvania has sufficient contacts with this litigation, the substantive law of Pennsylvania will be applied to the claims predicated on breach of contract and breach of warranty. *See Eastern Associated Coal Corp. v. Aetna Casualty & Surety Company,* 632 F.2d 1068, at 1073, n.7 (3d Cir., 1980) (citing cases).

**9.** In 1979, as part of the continuing process of consolidation and codification of Pennsylvania law, the Pennsylvania legislature transferred the text of the Uniform Commercial Code to title 13 of the Pennsylvania Consolidated Statutes. In so doing, however, the legislature provided that the substantive law which had developed under the Code was left unchanged by the transfer. *See* 13 Pa.Cons.Stat.Ann. § 1101 (Purdons Pamphlet 1980) (explanatory notes).

under the contract is determined by the good faith output or requirements of the parties. This does not mean, however, that the statute of frauds' requirement of a quantity term is obviated since the inclusion of a quantity term is a mandatory requirement under the Code. *See Doral Hosiery Corporation v. Sav-A-Shop, Inc.,* 377 F.Supp. 387, 388 (E.D.Pa.1974). While the quantity term in requirements contracts need not be numerically stated, there must be some writing which indicates that the quantity to be delivered under the contract is a party's requirements or output. *See Cox Caulking & Insulating Co. v. Brockett Distributing Co.,* 258 S.E.2d 51 (Ga.App. 1979); 3 U.C.C. § 2.04 & n.27.2 [Bender] (citing cases).

■ EDC asserts that the termination letter dated August 10, 1978, the invoices of the individual transactions between the parties and a letter dated November 18, 1974, satisfy the requisite quantity term. While the above documents may indicate that the parties had an ongoing business relationship, they do not, expressly or by implication, reflect that the contract between the parties was for the supply of EDC's requirements of Masel's products.

■ First, the invoices of the individual sales transactions do not indicate that a requirements contract was entered into. They reflect only the quantity of goods shipped in each transaction. (Plaintiff's Exhibit III, 25(a)). Invoices which solely reflect the terms of individual transactions do not indicate that quantity is to be measured by requirements and, accordingly, do not satisfy the quantity term requirement of the statute of frauds. *See e. g., Artman v. International Harvester Company, supra,* at 485; *Huyler Paper Stock Company v. Information Supplies Corporation,* 117 N.J. Super. 353, 362, 284 A.2d 568 (1971).

Similarly the letter signed by EDC on Masel's letterhead dated November 18,

1974, fails to satisfy the statute of frauds. It provides:

Isaac Masel Company is importing a line of dental instruments which they will supply to Eastern Dental Corporation at a very small markup. Isaac Masel Company is advancing a large sum of money for these products, and would like assurance from Eastern Dental Corporation that—

A. Eastern Dental Corporation will not contact Masel's supplier or purchase from Masel's supplier for a period of five years.

B. Eastern Dental Corporation will not purchase similar instruments from any other source unless Masel can not supply them or until Masel's stock is exhausted, so that Masel will not get stuck with this merchandise.

I agree to the above terms.

Eastern Dental Corporation
/s/ Vincent Santulli
Vince Santulli—Pres.
/s/ Neil Miller
Neil Miller—Vice-Pres.

Date 11/18/74"

Although this letter arguably indicates that EDC would purchase its requirements of a certain line of dental instruments from Masel, the record clearly establishes that it is a memorandum of an agreement unrelated to the contract which EDC is attempting to prove in this case. The subject matter of this letter was dental pliers, a product which neither party had dealt with previously. It is evident from Miller's deposition that the parties viewed their arrangement concerning these pliers as being distinct from any other arrangement they may have had. Miller pointed out that the letter was not a true memorandum of the intent of the parties. He stated that the parties, in fact, had entered into an exclusive dealing arrangement whereby Masel was obligated to market these pliers through EDC.[10] At no point in the course of these proceedings has EDC asserted that the purported require-

10. Miller Deposition at 308 09.

ments contract was also an exclusive dealing contract. Indeed, the record would not support such an assertion.

It is clear that EDC was just one of Masel's many customers for the items which are the subject matter of the purported requirements contract. In fact, both EDC and Masel sold these products on the retail level in competition with each other.[11] Thus, whatever may have been the contractual arrangement between the parties concerning facebows, elastics, lingual buttons and cleats, it is clear that Masel was not obligated to market these products solely through EDC. The November 18, 1974 agreement, therefore, is distinct from the contract which plaintiff is attempting to prove in the instant case. Accordingly, the presence of a quantity term, if it is such, in that agreement cannot serve to satisfy the statute of frauds for the purported contract which is before me.

Finally, plaintiff's contention that the quantity term is supplied by the termination letter is not supported by the record. The termination letter provides:

"Gentlemen:

We are enclosing our check No. 7290 in the sum of $599.05. At the present time, we are too busy to handle your orders, and we make the least amount of profit manufacturing for other manufacturers. As something had to give, we decided to eliminate this type of account.

If we pick up enough additional, capable, new help making it possible for us to handle your account again, we will contact you.

Please understand our position.

Very truly yours,

ISAAC MASEL CO., INC.

J. J. Masel"

All that this letter indicates is that the parties had an ongoing business relationship. There is nothing in it suggesting that the "type of account" was a requirements account, or that Masel was to supply all that EDC needed. This letter, therefore, also fails to state a quantity term sufficient to satisfy the statute of frauds.

The remaining documents submitted by the parties also fail to state the requisite quantity term. There are documents concerning credit terms and future shipments of merchandise, but there is no document expressly or impliedly providing that Masel was to supply all of EDC's requirements. I must, therefore, grant defendant's motion for summary judgment on count III of the complaint because the contract fails to satisfy the statute of frauds.

### IV. *LOSS OF GOODWILL*

EDC, in all three counts of its complaint, alleges that it is entitled to damages for loss of its goodwill and reputation. Complaint ¶¶ 14, 27(e), 35. Masel contends that, as a matter of law, EDC cannot recover such damages.

■ As to any claim predicated on a breach of contract or breach of warranty, Masel is clearly correct. Pennsylvania law does not permit the recovery of damages for loss of goodwill or reputation in any action based on either a breach of contract or a defective product. *See, e. g., Neville Chemical Company v. Union Carbide Corporation,* 422 F.2d 1205, 1225, *cert. denied,* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970); *Kassab v. Central Soya,* 432 Pa. 217, 237 n.12, 246 A.2d 848 (1968); *Harry Rubin & Sons, Inc. v. Consolidated Pipe Co. of America, supra* at 513, 153 A.2d 472. *See generally,* Comment, Loss of Goodwill and Business Reputation as Recoverable Elements of Damages Under Uniform Commercial Code § 2–715. The Pennsylvania Experience, 75 Dick.L.Rev. 63 (1970–71).

■ The Pennsylvania rule, however, does not control in federal antitrust cases, it is federal law which governs the issue of damages in such cases. *See* 1A Moore's Federal Practice ¶ 0.323[2] (1979). *Cf. Ne-*

---

11. Masel Deposition at 13.

*ville, supra,* 422 F.2d at 1227 n.36 (federal antitrust law does not control the issue of whether damages for loss of goodwill is allowed in a defective product case decided under Pennsylvania law). The measure of damages in antitrust cases "will be ... the ... pecuniary loss to the claimant's business or property." 15 VonKalinowski, Business Organization, § 115.03[1] at 115–59. The courts have recognized that loss of goodwill or loss of the business' value as a going concern is one method of computing an antitrust plaintiff's pecuniary loss. *See, e. g., Kestenbaum v. Falstaff Brewing Corp.,* 514 F.2d 690, 698 (5th Cir. 1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976); *Pollock & Riley, Inc. v. Pearl Brewing Company,* 498 F.2d 1240, 1244–45 (5th Cir. 1974), *cert. denied sub nom., Gulf Oil Corp. v. Wood,* 420 U.S. 992, 95 S.Ct. 1427, 43 L.Ed.2d 673 (1975); *Albrect v. Herald Company,* 452 F.2d 124, 129 (8th Cir. 1971) *mandamus denied,* 405 U.S. 1063, 92 S.Ct. 1493, 31 L.Ed.2d 810 (1972); *Simpson v. Union Oil Company of California,* 411 F.2d 897, 909 (9th Cir.), *reversed on other grounds,* 396 U.S. 13, 90 S.Ct. 30, 24 L.Ed.2d 13 (1969); *Vandervelde v. Put and Call Brokers and Dealers Association,* 344 F.Supp. 118, 150 (S.D.N.Y.1972); 15 VonKalinowski, *supra,* § 115.03[1], p. 115–62.

Accordingly, defendant's motion for summary judgment on the issue of damages for loss of goodwill will be denied as to the antitrust claim, but will be granted insofar as it relates to the breach of warranty claim (count II).